**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **ANTHONY ROBINSON** | : | **No. 21-175-2** |

## MEMORANDUM

PRATTER, J. FEBRUARY 16th, 2022

The standard to overturn a conviction for lack of evidence is extraordinarily high. The defendant in this case, Anthony Robinson, moves to overturn a jury's verdict finding him guilty of conspiracy to possess contraband in prison. Mr. Robinson has not met the high burden required of him. Thus, the Court denies his Rule 29 motion for judgment of acquittal.

### BACKGROUND

Inmates at the Federal Detention Center (FDC) in Philadelphia were caught bringing drugs into their cells. The inmates lowered a makeshift rope or line from a hole they created in their fourth-floor cell window down to the sidewalk of North 7th Street in Philadelphia. A person on the street attached a different rope, small enough to fit through the window hole and filled with drugs, to the inmates' rope. The inmates then raised both lines back up to the fourth floor in order to use and distribute the drugs.

A grand jury returned an indictment against four FDC inmates for this scheme: Joel Sambrano, Robert Patterson, Anthony Robinson, and Kaleaf Gilbert. Each man was charged was three counts: one count of conspiracy to possess contraband in prison in violation of 18 U.S.C. § 371 and two counts of possession of contraband in prison in violation of 18 U.S.C. § 1791(a)(2).

Mr. Sambrano and Mr. Patterson both pled guilty and agreed to cooperate with the Government as witnesses. Mr. Robinson and Mr. Gilbert proceeded to trial.

After a four-day trial, a jury convicted Mr. Robinson of count one: conspiracy to possess contraband in prison in violation of 18 U.S.C. § 371. The jury found Mr. Gilbert not guilty on all three counts. The Court recounts the evidence of the case introduced at trial that is most pertinent to Mr. Robinson's motion.

## I. The Events Leading Up to April 15, 2020

The Government called both Mr. Sambrano and Mr. Patterson. Both witnesses testified and described the scheme to bring drugs into the FDC through the hole in the window of their shared cell, cell number 416.

The men worked to create a hole in their window for the purpose of bringing drugs into the FDC. Oct. 27, 2020 Tr. at 17:14–18:2, 18:22–24 (Mr. Patterson); *id.* at 143:16–20 (Mr. Sambrano). They used a knife, a screw, and a homemade candle to drill into the window. *Id.* at 18:11–18, 19:17–25, 20:2–12 (Mr. Patterson); *id.* at 144:15–16 (Mr. Sambrano). Mr. Patterson and Mr. Sambrano created the "line" out of the wrappers from their eating utensils and attached batteries and other weights to help the line reach the street. *Id.* at 21:14–23 (Mr. Patterson); *id.* at 145:15–20 (Mr. Sambrano).

They involved Mr. Robinson, they say, because he had access to a cell phone and because he was local to Philadelphia and knew people outside the FDC who would be willing to help. *Id.* at 22:7–16 (Mr. Patterson); *id.* at 146:1–5, 147:5–11 (Mr. Sambrano). Apparently, Mr. Robinson would coordinate with people to wait outside the prison with the contraband. He would then, the witnesses said, direct Mr. Patterson and Mr. Sambrano when to raise and lower the line to the street by communication through a hole in the wall of his cell, number 450, to Mr. Gilbert's cell, number 449, who would then communicate that message down to Mr. Patterson's and Mr. Sambrano's cell

via a shared plumbing, heating, and HVAC shaft. *Id.* at 25:10–25 (Mr. Patterson); *id.* at 147:7–149:20 (Mr. Sambrano).

Lieutenant Maynard, an officer at the FDC, confirmed that detainees could communicate through the shared plumbing, heating, and HVAC shaft. The fourth floor of the FDC had two tiers of cells opening onto a common area, with the top tier overlooking the common space. Oct. 26, 2021 Tr. at 63:6–15. The HVAC, plumbing, and electrical lines running to the various cells service multiple cells. *Id.* at 64:5–10. In other words, two cells on the top tier of cells share the same shaft with two cells on the bottom tier. Cells 448 and 449 (Mr. Gilbert's cell) on the top tier share the same shaft with cells 417 and 416 (Mr. Sambrano's and Mr. Patterson's cell) on the bottom tier. *Id.* at 67:18–19.

According to Mr. Sambrano and Mr. Patterson, the group had tried to bring in contraband at least two times prior to April 15, 2020. The first time, on April 11, 2020, the group successfully brought in the contraband. Oct. 27, 2021 Tr. at 23:13–25:25 (Mr. Patterson); *id.* at 110:18–21 (Mr. Sambrano). They attempted to do the same on a different day that same week but were unsuccessful when the line got stuck on something on the outside wall of the FDC. *Id.* at 38:17–40:5 (Mr. Patterson); *id.* at 153:6–154:16 (Mr. Sambrano).

After the unsuccessful attempt, Mr. Patterson testified that Mr. Robinson visited his and Mr. Sambrano's cell and allegedly stated, "[Y]ou guys are messing up. You had my people out there all night." *Id.* at 40:12–17.

As to the successful attempt, Mr. Robinson was apparently involved not only with the retrieval of drugs from the street, but also with the subsequent divvying up of the drugs within the FDC. Mr. Patterson testified that he received a note that he believed to be from Mr. Robinson explaining that people had paid for the drugs brought in and that Mr. Patterson needed to give the

buyers of those drugs a portion of them. *Id.* at 30:13–31:3. Both Mr. Sambrano and Mr. Patterson testified that they were to keep around 30% of the drugs they brought in and that Mr. Patterson distributed the other approximately 70% to others within the FDC as directed by Mr. Robinson. *Id.* at 32:1–6; 76:22–77:3 (Mr. Patterson); *id.* at 151:3–7, 152:24–153:5 (Mr. Sambrano).

According to Mr. Patterson, Mr. Robinson also visited his and Mr. Sambrano's cell after the successful attempt. *Id.* at 32:15–24. Apparently, Mr. Robinson examined the hole in the window and took out a cell phone to compare it to the size of the hole and then allegedly stated "Oh, okay, you guys weren't lying, it's not big enough." *Id.* at 32:25–33:5.

## II. April 15, 2020 Incident and Search of Mr. Patterson's and Mr. Sambrano's Cell

On April 15, 2020, the group decided to try again. At approximately 2:45 a.m., Officer La Luz of the FDC noticed a man in front of the FDC appearing to reach down and pick something up from the sidewalk. Oct. 26, 2021 Tr. at 30:13–23. Surveillance video showed that a line had been lowered down the front of the FDC from one of the higher floors and that the man on the street had dropped an additional rope-like thing on the sidewalk before the original line was raised back up the front of the FDC. Gov. Ex. 103. The rope-like thing dropped back to the sidewalk shortly thereafter. *Id.* The same man then returned to the front of the FDC and again interacted with the rope-like thing, reattaching it to the line coming down the front of the FDC. *Id.* Having seen this same man for a second time and having heard a "ding" as something hit the glass of a window of the FDC, Officer La Luz and other FDC staff went outside to investigate. Oct. 26, 2021 Tr. at 39:19–40:11; 41:11–13. The man ran away. By counting the windows, Officer La Luz and the other FDC staff identified that the line was coming from the bottom tier of cells on the fourth floor of the FDC, from a cell between numbers 411 and 419. *Id.* at 40:13–23.

FDC staff then proceeded to the fourth floor to investigate further. *Id.* at 50:3–6. The staff discovered that the inmates in cell 416, Joel Sambrano and Robert Patterson, were still awake with the lights on. *Id.* at 50:23–51:1. After the lieutenant on the shift arrived and the two inmates in the cell were secured, FDC staff opened the door of cell and smelled marijuana smoke; both inmates appeared to be under the influence of drugs. *Id.* at 51:10–52:4, 79:12–15. Both inmates were then removed from the cell. *Id.* at 51:9–16. Lieutenant Maynard, the lieutenant on duty at the time, returned to the cell to investigate and discovered a hole in the window of the cell and the line Mr. Patterson and Mr. Sambrano had been using to bring in drugs. *Id.* at 80:8–9, 83:9–84:10. He confiscated the line. *Id.* at 81:12–82:5.

The next lieutenant on duty, Elizabeth Shannon, picked up the investigation where Lieutenant Maynard had left off. *Id.* at 82:6–10. She examined and deconstructed the line, discovering substances that tested positive for suboxone, cocaine, methamphetamine, and marijuana. Gov. Exs. 104, 105, 106, 107, 313; Oct. 27, 2021 Tr. at 234:10–236:24. FDC officers also searched the mattresses within Mr. Sambrano's and Mr. Patterson's cell and discovered a black L8Star cell phone within Mr. Sambrano's mattress. Oct. 26, 2021 Tr. at 149:6–150:21. At the time of this discovery, the cell phone had no SIM card in it, *id.* at 151:19–20; Oct. 28, 2021 Tr. at 32:12–13, and the phone would not hold a charge, Oct. 28, 2021 Tr. at 32:6–8. In other words, it was inoperable.

### III. April 22, 2020 Search of Mr. Robinson and Mr. Robinson's Cell

One week later, on April 22, 2020, after receiving a tip, officers conducted a search of Mr. Robinson. Oct. 27, 2021 Tr. at 240:10–12. As part of that search, FDC staff discovered a small black cell phone concealed in Mr. Robinson's buttocks area. *Id.* at 241:7–8. Similar to the phone retrieved from Mr. Sambrano's mattress, Mr. Robinson's phone was also a black L8Star cell phone, but this phone had a SIM card inside. *Id.* at 242:22–23.

Just before trial, more than a year later, officers inspected Mr. Robinson's cell and found a hole in wall between his cell, number 450, and the cell next to it, number 449, where Mr. Gilbert and his cellmate were held. Oct. 26, 2021 Tr. at 75:9–10, 161:15–22. Mr. Mendek, the FDC staff member who searched Mr. Robinson's cell at the time, on April 22, 2020, testified that holes were common in the walls of the FDC. Oct. 27, 2021 Tr. at 249:13–15. He, however, could not recall whether he specifically found a hole in the wall of Mr. Robinson's cell at that time. *Id.* at 249:7–9. Mr. Patterson said that there was a hole in April 2020, *id.* at 35:5–12, and he confirmed that the hole in September 2021 was the same size and in the same condition as it was in April 2020, *id.* at 38:14–16.

## IV. Amya Robinson's Presence Near the FDC on April 15, 2020

The Government also called Mr. Robinson's niece, Amya Robinson, as a witness. She admitted that she was in the area of the FDC on April 15, 2020 at the time of the incident. Oct. 26, 2021 Tr. at 126:15–22. Ms. Robinson explained that, despite the COVID-19 pandemic restrictions in place at the time, she typically visited the area around the FDC between 2:30 a.m. and 3:00 a.m. to eat and party, and that during April 2020 she visited the area near the FDC between 2:00 a.m. and 3:00 a.m. approximately three times a week. *Id.* at 126:18–128:8. Ms. Robinson also testified that she drove a black Honda CRV with a replacement hood and a spare tire on the back. *Id.* at 124:23–125:12. The surveillance video captured a car fitting that description driving past the FDC at the time of the April 15, 2022 incident. Ms. Robinson testified that "it could possibly be" her car. *Id.* at 130:11. The surveillance video also showed the man who attached the drug-laden rope to the inmates' line next to this same car. Gov. Ex. 103; Oct. 26, 2021 Tr. at 131:14–21. Amya Robinson testified that she did not know the man. Oct. 26, 2021 Tr. at 131:19.

### V. The Cell Phone Records

The FBI searched Mr. Robinson's cell phone and discovered that phone's number ended in the four digits 6971. Oct. 28, 2021 Tr. at 34:23–24. The phone's records demonstrated that, at the time of the April 15, 2020 incident, Mr. Robinson's phone was in contact with cell phone numbers ending in the four digits 1998 and 0202. *Id.* at 104:9–15, 105:18–21. The 1998 number belonged to Mr. Robinson's niece, Amya Robinson. Oct. 26, 2021 Tr. at 125:24–126:5; Oct. 28, 2021 Tr. at 73:19–23. The Government did not introduce any information as to the identity or the cell site location information for the 0202 number.

Starting at 2:28 a.m., Mr. Robinson was on a 36-minute call with the number ending in 0202. Oct. 28, 2021 Tr. at 104:10–19. Amya Robinson's phone was also in touch with the number ending in 0202 for approximately 31 minutes at the same time. *Id.* at 107:13–21. Amya Robison's cell phone initiated a conference call. *Id.* at 106:23–107:16. In other words, Mr. Robinson's number (6971) called the unknown number (0202), the unknown number (0202) then called Amya Robinson's number (1998) and, at some point, Amya Robinson (1998) initiated a conference call between all three numbers. *Id.* Amya Robinson's cell phone (1998) was accessing a cellular tower next to the FDC at the time of these calls. *Id.* at 110:20–112:12.

## LEGAL STANDARD

"A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later. . . If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c).[1] A court analyzing such a motion must "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof

[1] Mr. Robinson submitted his motion within the 14-day period.

of guilt beyond a reasonable doubt based on the available evidence. *United States v. Wolfe*, 245 F.3d 257, 261 (3d Cir. 2001); *accord Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The court is required to "draw all reasonable inferences in favor of the jury verdict." *United States v. Anderskow*, 88 F.3d 245, 251 (3d Cir. 1996). And, when reviewing such a motion, "[c]ourts must be ever vigilant. . . not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005). Stated succinctly, "a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (per curiam) (quoting *Jackson*, 443 U.S. at 326)).

A defendant making a motion for judgment of acquittal must overcome an "extremely high" burden when challenging a jury verdict based on the sufficiency of the evidence. *United States v. Iglesias*, 535 F.3d 150, 155 (3d Cir. 2008) (quoting *United States v. Lore*, 430 F.3d 190, 203–04 (3d Cir. 2005)). In other words, a court's "finding of insufficiency should 'be confined to cases where the prosecution's failure is clear.'" *United States v. Smith*, 294 F.3d 473, 477 (3d Cir. 2002) (quoting *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984)).

## Discussion

To prove the existence of a conspiracy under 18 U.S.C. § 371, the Government must prove four elements beyond a reasonable doubt. These are:

1. That two or more persons agreed to commit an offense(s) against the United States, as charged in the indictment.

2. That the defendant was a party to or member of that agreement.

3. That the defendant joined the agreement or conspiracy knowing of its objective(s) to commit an offense(s) against the United States and intending to

join together with at least one other alleged conspirator to achieve that objective(s); that is, that the defendant and at least one other alleged conspirator shared a unity of purpose and the intent to achieve a common goal(s) or objective(s), to commit an offense(s) against the United States; and

4. That at some time during the existence of the agreement or conspiracy, at least one of its members performed an overt act in order to further the objectives of the agreement.

*See* Mod. Crim. Jury Instr. 3d Cir. 6.18.317A (2018); *accord United States v. Rigas*, 605 F.3d 194, 207 (3d Cir. 2010).

Mr. Robinson makes three arguments as to why the Court should acquit him of this count. First, he argues that Mr. Gilbert's acquittal necessarily means his involvement in the conspiracy was negated. Second, he argues that Amya Robinson's presence in the vicinity of the FDC does not prove Mr. Robinson's participation in any conspiracy absent more evidence. Third, he argues that the Government failed to prove the existence of the hole between his cell and Mr. Gilbert's cell. In other words, Mr. Robinson seems to be contesting elements (1) and (2) above both as a matter of law and as a matter of fact. The Court addresses each in turn.

## I. Mr. Gilbert's Acquittal Does Not Affect the Existence of a Conspiracy as a Matter of Law

Mr. Gilbert's involvement, or lack thereof, does not affect the existence of a conspiracy as a matter of law. The Government need prove only that two or more people in some way agreed to accomplish an unlawful objective. *See* Mod. Crim. Jury Instr. 3d. Cir. 6.18.371C (2018). That evidence, like evidence of the conspiracy more generally, can be circumstantial. *See, e.g.*, *United States v. John-Baptiste*, 747 F.3d 186, 203 (3d Cir. 2014) (concluding jury could have found existence of conspiracy when one police officer knew of and acquiesced in other officer's unlawful behavior); *United States v. Whiteford*, 676 F.3d 348, 357–58 (3d Cir. 2012) (finding sufficient evidence to permit a jury to find that the defendant "knew of or closed his eyes" towards a bribery scheme). The Government also does not need to prove that Mr. Gilbert was involved in the

conspiracy in order for the jury to convict Mr. Robinson. *United States v. Kelly,* 892 F.2d 255, 259 (3d Cir. 1989) ("Failing to prove that all named co-conspirators conspired with the defendant is not fatal to the government's case.").

Whether or not Mr. Gilbert was actually involved in the conspiracy as a matter of *fact* would not affect the Government's ability to prove the existence of a conspiracy as a matter of *law*. As a matter of law, a jury could have found that Mr. Robinson satisfied both elements (1) and (2) listed above with or without Mr. Gilbert's involvement.

Here, there was abundant evidence that Mr. Robinson and at least one other person *separate from* Mr. Gilbert agreed to commit an offense against the United States. Both Mr. Patterson and Mr. Sambrano testified to Mr. Robinson's involvement. Specifically, they testified that Mr. Robinson had helped to arrange the prior unsuccessful attempt to bring drugs into the FDC and the prior successful introduction of drugs into the FDC on April 11, 2020. They both also stated that Mr. Robinson had directed them to give a percentage of those drugs to others within the FDC. Mr. Patterson also testified that after the successful introduction on April 11, 2020, Mr. Robinson checked on the status of the hole in the window to confirm that it was not yet large enough to accommodate the introduction of the cell phones that Mr. Robinson hoped to introduce into the FDC. In other words, there was sufficient evidence of a conspiracy between Mr. Sambrano, Mr. Patterson, and Mr. Robinson, full stop.

There were also the cell phone records showing that Mr. Robinson on a phone call with his niece, Amya Robinson, who was near the FDC, and at least one other unidentified person during the time of the April 15 incident. The jury could have *also* found that Amya Robinson and/or the person with the unidentified phone number were part of the same scheme.

Again, the jury only needed to find that Mr. Robinson and one other person agreed to commit an offense against the United States. The jury had at least four people other than Mr. Gilbert that they could have found to be Mr. Robinson's co-conspirator(s). Construing the evidence in favor of the Government and the jury's verdict, as the Court is required to do, there is ample evidence in the record to support the jury's finding that Mr. Robinson and one other person agreed to commit an offense against the United States and that Mr. Robinson was involved in that agreement. Thus, as a matter of law, whatever Mr. Gilbert's involvement, a rational jury could still have convicted Mr. Robinson of conspiracy to possess contraband in prison in violation of 18 U.S.C. § 371.

## II. A Rational Jury Could Have Found Factual Proof Beyond a Reasonable Doubt that Mr. Robinson Was a Party to or Member of an Agreement to Possess Contraband in Prison

In light of the guilty verdict, the Court must determine whether "the evidence at trial would have allowed a reasonable juror to conclude beyond a reasonable doubt that the defendants shared a unity of purpose, or the intent to achieve a common goal and an agreement to work together toward the goal." *United States v. Applewhaite*, 195 F.3d 679, 684 (3d Cir. 1999) (internal quotation marks omitted). Further, each element of a conspiracy may be proven through circumstantial evidence alone. *Id.* In other words, the Court need not find any *direct* evidence of Mr. Robinson's involvement in a conspiracy, only that a reasonable jury could have found, given the evidence, that Mr. Robinson and at least one other person agreed to possess contraband in prison. *See United States v. Bailey*, 840 F.3d 99, 108 (3d Cir. 2016) (quoting *United States v. Kapp*, 781 F.2d 1008, 1010 (3d Cir. 1986)) (stating elements of a conspiracy and noting that a conspiracy can be inferred when "the defendants could not have carried out their activities 'except as a result of a preconceived scheme or common understanding.'").

Mr. Robinson insists that he did not enter any agreement with any person to introduce drugs into the FDC and that the Government introduced insufficient evidence for any jury to find otherwise. This is based on three premises. First, Mr. Robinson contends that Mr. Gilbert's acquittal breaks the communication link between himself and Mr. Sambrano's and Mr. Patterson's cell. Second, he argues that Amya Robinson's presence in the vicinity of the FDC at the time of the events does not prove that he was part of the conspiracy. Third, Mr. Robinson avers that the Government's evidence of the hole between his cell and Mr. Gilbert's cell was entirely disproven at trial. The Court will address each in turn.

Mr. Robinson's first two arguments fall apart quickly. Without again reciting the same facts as above, there was ample evidence of Mr. Robinson's involvement in a conspiracy. There was also more than sufficient evidence of Mr. Robinson's involvement in a scheme with Mr. Patterson and Mr. Sambrano separate and apart from any other participants. In other words, whether or not Mr. Gilbert was involved as a matter of *fact* also does not affect Mr. Robinson's involvement as a matter of *fact*. There was more than enough evidence for a rational jury to have found the existence of a conspiracy between Mr. Robinson, Mr. Patterson, and Mr. Sambrano even if the jury concluded that Mr. Gilbert had no part at all in the scheme (a conclusion that the Court cannot infer anyway).

Moreover, and as the Government points out, Mr. Robinson's insistence that he could not be convicted given that Mr. Gilbert was acquitted is contradicted by the defense's own theory of the case. At trial, the Government's theory was that Mr. Gilbert was using the shared shaft to communicate with Mr. Sambrano and Mr. Patterson. But, as defense counsel noted, the communication through the shared shaft could have been between *any* members of the four cells that shared the shaft. Based on this, defense counsel suggested that Mr. Gilbert's cellmate, and not

Mr. Gilbert, might have been the one communicating Mr. Robinson's messages to Mr. Sambrano's and Mr. Patterson's cell. *See, e.g.*, Oct. 27 Tr. at 88:13–25; *id.* at 186:3–13; *id.* at 213:9–214:22. *For that very same reason*, the jury could have acquitted Mr. Gilbert but convicted Mr. Robinson; the jury could have found that Mr. Gilbert's cellmate was the one relaying the messages. Stated simply, Mr. Gilbert's acquittal does not mean that it was impossible for the jury to have found Mr. Robinson was involved in the conspiracy.

Mr. Robinson's second argument does not fare any better. He claims that Amya Robinson's alleged presence near the FDC at the time of the April 15, 2020 incidence does not prove his involvement in any conspiracy. But this argument fails for the very same reason just discussed. Stated differently, Mr. Robinson is correct—Amya Robinson's presence alone does not prove his involvement. But the converse of the same proposition is not true—even if there was no evidence of Amya Robinson's presence, it would not mean there was insufficient evidence of Mr. Robinson's involvement in a conspiracy. In other words, even absent any evidence of Amya's involvement, the Government introduced plenty of factual evidence, already discussed, of Mr. Robinson's involvement in a conspiracy for a rational jury to have found him guilty.

Mr. Robinson's third argument also misses the mark. At trial, the cooperators testified that there was a hole between Mr. Robinson's cell and Mr. Gilbert's. The government's witness, Mr. Mendek, did not remember finding such a hole. Based on this, Mr. Robinson argues that there was no hole. For support, he claims that no reasonable juror could believe Mr. Patterson, who testified that the hole existed. These arguments also do not advance Mr. Robinson's motion.

First, Mr. Mendek never said that the hole did not exist; he just said that *he did not remember finding one*. Mr. Robinson argues that "[i]t is inconceivable that Officer Mendek would have missed a hole." Doc. No. 57, at 3. But Officer Mendek testified that even if he had found it,

he would not necessarily have reported it unless he discovered contraband in it because such holes were common at the FDC. Oct. 27, 2021 Tr. at 249:1–15. Thus, to accept Mr. Robinson's argument, the Court would have to infer from Mr. Mendek's testimony that his not remembering a hole is equivalent to the hole not existing. But on a Rule 29 motion, the Court does the exact opposite; it "review[s] the record in the light most favorable to the prosecution." *Wolfe*, 245 F.3d at 261. Moreover, Mr. Patterson testified that a hole did exist—corroborating the Government's theory of the communication between Mr. Gilbert and Mr. Robinson.

Second, Mr. Robinson claims that Mr. Patterson's testimony was entirely incredible and that "the jury clearly rejected" it. Doc. No. 57, at 3. But that is entirely speculative. Mr. Robinson actually has no idea what the jury chose to believe or not to believe.[2] At this stage, the Court must be especially vigilant *not* to act as the thirteenth juror. *Brodie*, 403 F.3d at 133. Mr. Robinson's argument would require the Court to make not one but two impermissible inferences. At the outset, Mr. Robinson's argument would require the Court to make an *ex post* credibility determination regarding Mr. Patterson, which it cannot do. *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013) (en banc). Then, it would require the Court to infer that the jury disbelieved Mr. Patterson, opposite to the Court's role at this stage to review the record in the light most favorable to the prosecution. Last, Mr. Robinson's argument would require the Court to infer, based on its first impermissible inference, that the facts were actually opposite of what Mr. Patterson testified. But the Court must assume "that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Brown*, 558 U.S. at 133 (2010)

---

[2] Conceivably, even if the jurors believed that Mr. Gilbert passed the message along, they might have considered that insufficient to count as participation in a conspiracy. Again, the Court cannot infer what the jury concluded, but points out, for Mr. Robinsons' sake, that the jury *might* have made any number of potential inferences.

(quoting *Jackson*, 443 U.S. at 326). Thus, Mr. Robinson's argument would require this Court to act in contravention of its duty at this stage of the case.

Finally, this is all a superfluous point anyway because the jury could have reasonably found, based on ample evidence in the record, that Mr. Robinson was able to participate in the conspiracy *whether or not* there was any communication from his cell through any hole to Mr. Gilbert's cell, down to Mr. Sambrano's and Mr. Patterson's cell. Even if the Court were to take the impermissible step of reweighing the evidence and construing certain evidence against the Government, as the Court is forbidden from doing, the Government *still* introduced ample evidence of Mr. Robinson's involvement in the introduction of and doling out of drugs within the FDC sufficient for the jury to have found him guilty and thus for this Court to sustain his conviction and deny his motion.

## CONCLUSION

For all of the foregoing reasons, the Court denies Mr. Robinson's motion for judgment of acquittal.

**BY THE COURT:**

**GENE E.K. PRATTER**
**UNITED STATES DISTRICT JUDGE**